## THE W. A. MORRELL.[1]

## NATIONAL STEAM-SHIP Co. *v.* THE W. A. MORRELL and another.

*(District Court, S. D. New York.    May 17, 1886.)*

1. CARRIER—OF GOODS BY VESSEL—DELIVERY OF CARGO—DISPUTE AS TO QUANTITY—CARRIER'S RIGHT TO IMMEDIATE SETTLEMENT OF CONTROVERSY.
    A carrier is entitled to have settled upon the spot, in some form, any dispute concerning the number of articles delivered by him. He cannot be required to adjourn the controversy to a distant place, or a future time, for determination and settlement in a remote forum. The delivery is conditional only until such a receipt is either given or waived.

2. SAME—CARRIER'S RIGHT TO HAVE RECEIPT—ATTACHMENT OF CARGO FOR RECEIPT—TALLIES DISCORDANT—SUBSEQUENT DELIVERY TO OWNERS—COSTS.
    Where a dispute arose, upon discordant tallies, between the National Steamship Company and the schooner M., concerning the number of certain packages delivered by the former to the latter; and the schooner sailed away with the articles on board without any retally, or adjusting the controversy, or giving a clean receipt for the number she had actually received; whereupon the steam-ship company attached the whole of the articles, and also the schooner: *held,* that the steam-ship company was entitled to a receipt; and that the schooner, in departing without settling the controversy, and without giving or tendering a clean receipt, acted at her peril; and that the libel was therefore legally filed to arrest the whole quantity. *Held, further,* that as, after the bonding of vessel and cargo, the cargo had been delivered to the owners, and the latter had been compensated by the schooner for all shortage, no further question remained to be adjusted but that of costs and expenses, and these the libelant is entitled to recover, as the schooner was in fault, and the evidence does not establish any fault in the libelant.

3. ADMIRALTY—JURISDICTION—IMPLIED CONTRACT TO GIVE RECEIPT—MARITIME OBLIGATION.
    The claim of the libelant in this case rested wholly upon the obligation of the implied contract of the schooner to give a clean receipt for the packages taken aboard, and to have any doubt about the number settled before sailing. *Held,* that the obligation of the schooner to so receipt for the cargo was a maritime obligation within the jurisdiction of the admiralty.

*John Chetwood,* for libelant.
*Wilcox, Adams & Macklin,* for claimants.

BROWN, J.    In March, 1886, the steam-ship Queen, of the libelant's line, arrived in this port with 7,775 packages of iron wire, belonging to the American Screw Company of Providence. The company were in the habit of receiving similar consignments, and had arranged with the owners of the Morrell, and of other vessels, to take their goods from the dock when landed, to be transported to Providence. The wire in question was all landed upon the dock, was weighed by the custom-house weigher, and placed in six piles, on different parts of the dock. The Morrell took it all on board, and kept tally of the bundles taken. An employe of the libelants also kept tally; and the custom-house weigher kept tally of the weight, and, to a certain extent, of the bundles. The tally of the libelants' man exceeded by one the number stated in the bill of lading, making 7,776; the Morrell's tally made 108 bundles less. The captain of the Morrell refused to give a clean receipt for the full number of the steamer's

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

tally, except with the condition in the receipt, "108 in dispute." This qualification was refused, and the Morrell thereupon sailed away for Providence, whereupon this libel was filed to recover back the iron wire; and the Morrell and the wire were seized by the marshal before they had passed out of this jurisdiction. The freight on the whole number had been paid in full. After seizure by the marshal the ship and cargo were released upon a stipulation for the value of the 108 bundles of wire in dispute. Thereafter the schooner went to Providence, and, upon the delivery there, the tally showed 34 less than 7,776. The weigher's tally in New York was equal to the estimated weight in the bill of lading; and the tally of weight in Providence exceeded the weight stated in the bill of lading for the whole number.

1. The claimants object to the jurisdiction of this court on the ground that the nature of the libelants' demand is not maritime. But the libelants' claim, if valid, rests wholly upon the obligation of the implied contract of the schooner to give a clean receipt for the wire actually taken aboard, and to have any controversy as to the number adjusted before sailing for a distant port. The carrier had a special property in the wire, and was bound to deliver all that the bill of lading called for; and the schooner having taken the wire aboard, the obligation to receipt for it in discharge of the libelants was a maritime obligation. I must therefore sustain the jurisdiction.

2. The evidence shows a well-settled custom and usage that entitles the carrier to a receipt for the articles delivered. This is laid down as the general law of carriers. Hutch. Carr. § 423. Small differences are usually passed over by a memorandum in the receipt of the number in dispute or injured. But the evidence shows that this is not applicable to large variations. Sometimes, when articles have been loaded, and the first carrier can conveniently send a man to make a tally upon discharge by the second carrier, that course is adopted. The master of the schooner desired that course to be pursued in this case after the seizure under process, and he offered to take one of the libelants' men to Providence for the purpose. The libelants, on the other hand, offered, before she sailed, to unload the schooner upon the stipulation that the one found to be wrong upon another tally should pay the expense of unloading and reloading. This the master refused, and started upon his voyage without any settlement of the controversy, and without previous notice to the libelants, or the delivery of any receipt.

The carrier is entitled to have settled upon the spot, in some form, any dispute concerning the number of articles delivered by him. The custom that gives him a right to a receipt, recognizes his right to the protection which that voucher gives him for having performed his contract; and when a dispute arises as to the number delivered, the carrier is legally entitled to have it settled then and there. He cannot be required to adjourn the controversy to a distant place, or a

future time, for determination and settlement in a remote forum, for the convenience of another carrying vessel. Any such practice would be attended by great embarrassments, and interfere materially with the performance of the original carrier's duties. All deliveries by the carrier must therefore be held to be incomplete and conditional, and subject to the implied obligation of the person or vessel that receives the goods to give a proper and clean receipt for all the articles actually delivered, without qualification, unless such a clean receipt be waived. It is the duty of both, in case of dispute or differences in the tallies taken, to take promptly all necessary means to settle the controversy; and the expense necessarily attending the correction of any such errors must fall upon the one that caused the error. Where both are involved in blame, the expense must be charged upon both.

There can be no doubt, upon the proofs, that the tally of the schooner was kept incorrectly. As the tally at Providence was within 34 of the libelants' tally, the number put on board could not have been 108 short. In sailing away without adjusting this controversy, and without giving or tendering any clean receipt for the whole number she had actually received, she was in the wrong, and acted at her peril. The libel was therefore legally filed to arrest the whole quantity, as the libelants could not be deprived of their right of possession of the wire without a proper clean receipt for what they had delivered; and in that view the libel must be sustained.

The whole cargo delivered on board the Morrell has, however, been delivered to the true owners. A careful examination of the custom-house weigher's testimony, and of his tally of weight and numbers, satisfies me that they are in accord with, and confirm the correctness of, the tally kept by libelant's tally-man, and that 7,775 coils were put aboard the schooner. The custom-house weigher relied more on the weight of each 20, than on the actual count. His tally of weights shows a remarkable uniformity; the greatest weight of any 20 coils being 1,164 pounds, and the least weight 1,124 pounds,—a difference of only 40 pounds, which is less than the weight of a coil,—the average of the whole being $57\frac{1}{4}$ pounds per coil. Most of the sets of 20 weigh from 1,136 to 1,156 pounds. This shows that it is very improbable that there was any error in the number as tallied by the libelant in New York; and the delivery of a somewhat greater weight by tally at Providence leads to the conclusion that the entire number was actually delivered there. I am satisfied that the whole number has reached the hands of the true owners, and that the latter have no longer any claim against the libelants; and the libelants, having also been paid their freight, have no further interest in the wire. There should be no decree, therefore, for the wire or its value; but the libelant is entitled to the costs and disbursements of the proceedings, since the schooner was in fault, and the evidence, as finally submitted, does not establish any fault in the libelant, or in its proceedings.